**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

DUMONT TELEPHONE COMPANY,

              Plaintiff,

vs.

POWER & TELEPHONE SUPPLY
COMPANY, CSI DIGITAL, INC., and
I.P. NET, LLC,

              Defendants.

No. C 13-3030-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING POWER &
TEL'S MOTION TO COMPEL
ARBITRATION AND I.P. NET'S
MOTION FOR STAY**

---

**TABLE OF CONTENTS**

I.     **INTRODUCTION**..................................................................... 2
    A.   *Factual Background* ......................................................... 2
    B.   *Procedural Background* ...................................................... 7

II.    **ANALYSIS** ........................................................................ 8
    A.   *Choice of Law* ................................................................ 8
    B.   *Power & Tel's Motion to Compel Arbitration* ............................. 11
        1.   *Is there a valid arbitration agreement?* .............................. 11
        2.   *Does this dispute fall within the terms of the
            arbitration agreement?* ................................................. 23
    C.   *I.P. Net's Motion for Stay of Proceedings* ................................ 24

III.   **CONCLUSION** ................................................................... 26

The contract at the heart of this case is a lot like Bigfoot; both parties claim it exists, but each tells a different story of where it is and what it looks like. Presently, the parties dispute whether their contract contains an arbitration clause. But this dispute dates back to 2009, when the plaintiff, Dumont Telephone Company (Dumont), contracted with one of the defendants, Power & Telephone Supply Company (Power &

Tel), for Power & Tel to deliver modernized telecommunications equipment to Dumont. Power & Tel delivered the equipment, but it did not live up to Dumont's expectations. Dumont refused to pay for it and now each party claims that the other breached the contract.

I must determine the proper forum for the parties to resolve their dispute. Dumont wants to proceed in this court, claiming that the parties formed their contract in July 2009, and that it does not contain an arbitration clause. Power & Tel wants to proceed in a Tennessee arbitration, claiming that the parties formed their contract in October 2009, and that it contains an arbitration clause. This case is before me on Power & Tel's motion to compel arbitration (docket no. 8). Also before me is defendant I.P. Net, LLC's (I.P. Net's) motion for stay of proceedings (docket no. 26). Resolving these motions required me to search the record for the parties' elusive contract to see for myself whether it contains an agreement to arbitrate. It does. Thus, for the reasons discussed below, Power & Tel's and I.P. Net's motions are granted.

## I.    INTRODUCTION

In resolving Power & Tel's motion to compel arbitration, I must view the parties' factual allegations in the light most favorable to the nonmoving party, Dumont. *Quilloin v. Tenet HealthSystem Philadelphia, Inc.*, 673 F.3d 221, 228 (3d Cir. 2012). I note, however, that the parties do not appear to dispute the facts necessary to resolve Power & Tel's motion, only the legal conclusions to be drawn from those facts.

### A.    Factual Background

This case involves a contract—or series of contracts—for the sale of telecommunications equipment by Power & Tel to Dumont. Power & Tel is a Tennessee corporation that procures and sells telecommunications equipment to local telecommunications providers. The telecommunications equipment Power & Tel sells includes "video systems," which are bundles of equipment designed to provide a

2

particular set of video services. For over a decade, Power & Tel has provided telecommunications equipment to Dumont, an Iowa corporation that provides voice, video, and data telecommunications services to business and residential customers in Dumont, Iowa.

Although Dumont's business relationship with Power & Tel dates back to 1998, the underlying dispute in this case began in 2009. In April 2009, Dumont saw the need to modernize its video system to provide more competitive services. Dumont consulted with Power & Tel, and Power & Tel arranged for different equipment vendors to present their video systems to Dumont. Those vendors included defendants CSI Digital, Inc. (CSI) and I.P. Net. CSI is an Oregon corporation that integrates various components of video systems. I.P. Net is a Florida limited liability company that manufactures those components.

On April 15, 2009, Power & Tel and CSI gave a PowerPoint presentation at Dumont's office describing a potential replacement video system. The proposed replacement system—called the "head-end" system—would provide Dumont's customers with new video features that Dumont was not currently providing, including a TV-based web browser with access to internet radio, web content, and social media. The day after the presentation, CSI sent an e-mail to Dumont describing the I.P. Net equipment that would be included in the head-end system (Ex. 1; docket no. 15-2, at 7-17). Dumont decided to pursue a conversion from its current video system to the head-end system.

Most, if not all, of the parties' negotiations happened in July 2009. On July 1, 2009, I.P Net sent a letter to Dumont formally warranting the I.P Net equipment that would be included in the head-end system (Ex. 2; docket no. 15-2, at 18). The next day, July 2, 2009, Power & Tel district manager Michael Kean (Kean) e-mailed a price quote for the head-end system to Dumont general manager Roger Kregel (Kregel) (Ex.

3

3; docket no. 15-2, at 19-20). In the e-mail, Kean described Power & Tel's price quote as "the final quote with the verbiage in it for the use of return if not as designed" (Ex. 3; docket no. 15-2, at 19). "The verbiage" refers to language added to the "Notes" section on the quote at Dumont's request, which read: "Support charges will not start until 60 days after installation of equipment in the event the customer and CSI determine the product does not work satisfactorily up to 60 days after installation, customer can return for full refund" (Ex. 3; docket no. 15-2, at 20).

The quote purported to be a "cost estimate for Dumont Telephone." It contained the words: "For Budgetary Purposes only." It also listed a number of items of equipment. Some items were quoted at a specific quantity; others simply had "1" listed as the quantity. Some items were quoted at a specific price; others had no price listed. The quote did, however, list a "Head-End Total" of $152,471. The Notes section required Dumont to pay 55% of the price when it made its purchase order, 35% of the price upon delivery, and 10% of the price at a later time. The Notes also contained several comments about the head-end system's price:

- "Pricing is subject to site survey and customer requirements";
- "Third party equipment/software pricing is subject to change";
- "Travel costs are not included in the price estimate"; and
- "STB options and installation and support are not included in the Head-End Total"

(Ex. 3; docket no. 15-2, at 20). The term "STB" refers to "set top boxes," which are small boxes that are installed with customers' TVs as part of the head-end system.

On July 6, 2009, Kean and Kregel spoke about the quote over the phone. The parties have provided little information about the details of Kean's and Kregel's conversation. But, based on the parties' dealings after the phone call, two things are clear. First, the parties orally negotiated a set of terms for Dumont's initial equipment

4

purchase, which added to, and modified, the terms in Power & Tel's quote. Second, the parties agreed to move forward with the head-end deal, and Kregel agreed to deliver a check to Power & Tel for 55% of the initial equipment purchase price.

Later that day, Kregel sent an e-mail to Kean confirming the prices of the equipment in the initial order, the total price of the initial purchase, and the amount of Dumont's down-payment check (Ex. 4; docket no. 15-2, at 21). One of the items included in Kregel's e-mail is "I.P. Net Head End" listed at $152,471, which is the same number listed in Power & Tel's quote. But Kregel's e-mail listed additional equipment not included in the quote price:

- "30—HD Boxes No PVR @ $274 = $8,220.00";
- "30—HD Boxes With PVR @ $306 = $9,180.00"; and
- "60—Wireless Antenna's [sic] @ $17.98 = $1,078.80"

(Ex. 4; docket no. 15-2, at 21). This additional equipment included 60 STBs (*i.e.*, "boxes") and 60 antennas, costing $18,478.80. The STBs priced at $306 were discounted from the $331 price listed in Power & Tel's quote (Ex. 3; docket no. 15-2, at 20). Adding the STBs and antennas to the I.P. Net Head End price, Kregel's e-mail confirmed a total initial equipment price of $170,949.80. It also confirmed a 55% check amount of $94,022.39. Finally, Kregel noted in the e-mail that it was intended to "double check" the prices "because [Kregel] didn't think this was the exact figure [Kean] said this morning," presumably during their phone conversation (Ex. 4; docket no. 15-2, at 21).

The next day, June 7, 2009, Kregel gave Power & Tel a down-payment check, which cleared Dumont's bank account on July 21, 2009. Upon receiving the check, Power & Tel generated an invoice reflecting the down-payment (Ex. 1, docket no. 19-2, at 1-2). The invoice lists the down-payment amount as $83,859.05. Neither party explains why this number is different than the $94,022.39 figure listed in Kregel's July

6, 2009, e-mail, though $83,859.05 appears to be 55% of the I.P. Net Head End price before adding in the STBs and antennas. The invoice also contained Power & Tel's standard terms and conditions, including its arbitration clause:

> Any dispute, controversy or claim shall be solely and finally settled by arbitration conducted in Memphis, Tennessee in accordance with the Commercial Arbitration rules of the American Arbitration Association then in force. The parties shall abide by all awards rendered in arbitration proceedings, and all such awards may be enforced and executed upon by any court having jurisdiction over the party against whom enforcement of such award is sought.

(Ex. 1, docket no. 19-2, at 2). Dumont claims it never received this down-payment invoice. Power & Tel cannot say that it did or did not send the down-payment invoice to Dumont. The record contains no evidence suggesting that Dumont received this invoice.

After Dumont tendered its down-payment, Power & Tel instructed I.P. Net and CSI to begin manufacturing the parts Dumont had ordered. The equipment was ready for shipment in October 2009. That month, I.P. Net delivered Dumont's equipment to Power & Tel, and Power & Tel then delivered that equipment to Dumont. Power & Tel also sent Dumont an invoice for the equipment dated October 21, 2009, and listing the price as $53,364.85, which is 35% of the I.P. Net Head End price listed in Kregel's July 6, 2009, e-mail (Ex. 2; docket no. 8-2, at 11-12). This invoice, like the one before, contained Power & Tel's arbitration clause. Dumont acknowledges that it received this invoice.

Over the next two years, Dumont placed four additional orders with Power & Tel for head-end equipment. Power & Tel fulfilled each of these orders and accompanied each with an invoice containing its arbitration clause (Ex. 2; docket no. 8-2, at 13-20). In total, between October 2009 and September 2011, Power & Tel sent

Dumont five separate invoices covering Dumont's head-end equipment orders. All five invoices contained the same arbitration clause. Dumont acknowledges receiving these invoices.

While Dumont continued to order head-end equipment between 2009 and 2011, the head-end system never worked as Dumont had hoped. Dumont received hundreds of customer complaints reporting problems with the head-end system's functionality. According to Dumont, those problems were never resolved. Finally, on November 13, 2012, Dumont sent Power & Tel a letter expressing Dumont's dissatisfaction with the head-end system (Ex. 5; docket no. 15-2, at 22). In the letter, Dumont listed the five invoices associated with the head-end system, stated that Dumont had "already paid $94,022.39 for a product that does not work," and announced that Dumont would not pay the outstanding invoices (Ex. 5; docket no. 15-2, at 22).

The head-end system, however, was neither the first nor the last of Dumont's dealings with Power & Tel. According to Power & Tel's records, Power & Tel has conducted 789 sales with Dumont between 1998 and 2013: 510 from 1998 to 2008, and 279 from 2009 to 2013. Only five of those invoices relate to the head-end system. Power & Tel claims each of the 789 sales included an invoice with its arbitration clause. Dumont has never objected to that arbitration clause before this lawsuit.

### B.     *Procedural Background*

After receiving Dumont's November 13, 2012, letter stating that Dumont would not pay Power & Tel's invoices, Power & Tel filed an arbitration action against Dumont with the American Arbitration Association (AAA) on May 30, 2013 (Ex. 6; docket no. 15-2, at 23-34). In Power & Tel's arbitration demand, it asserted claims against Dumont for breach of contract and unjust enrichment. According to Dumont, receiving Power & Tel's demand was the first Dumont knew that Power & Tel claimed that the head-end contract included an arbitration agreement. On June 13, 2013,

7

Dumont received a letter from the AAA discussing pre-arbitration matters (Ex. 7; docket no. 15-2, at 50-51).

On June 17, 2013, Dumont filed a complaint in this court seeking a declaratory ruling and injunction against Power & Tel's arbitration proceeding (docket no. 1). Dumont also asserts a number of claims against Power & Tel, CSI, and I.P. Net: breach of contract (Power & Tel), breach of express warranty (all defendants), breach of implied warranties (Power & Tel and I.P. Net), and negligent misrepresentation (all defendants). That same day, Dumont filed a motion for preliminary injunction seeking an injunction against the arbitration (docket no. 2). On July 12, 2013, Dumont withdrew its motion for preliminary injunction after Power & Tel agreed to stay the arbitration until I decided whether the head-end contract is arbitrable (docket no. 7). That same day, Power & Tel filed a motion to compel arbitration (docket no. 8). Dumont filed a resistance on July 29, 2013 (docket no. 15), and Power & Tel filed a reply on August 6, 2013 (docket no. 19). Finally, I.P Net filed a motion for stay of proceedings on August 14, 2013 (docket no. 26).

I must now decide whether the head-end contract contains an arbitration clause covering Dumont's claims in this case. If it does, this case must proceed in the Tennessee arbitration. If it does not, Dumont may proceed in this court.

## II.    *ANALYSIS*

### A.    *Choice of Law*

While not specifically addressed by either party, this case presents a choice of law issue. We have a contract involving parties from different states—Dumont, an Iowa corporation, and Power & Tel, a Tennessee corporation. Thus, before deciding the terms of the head-end contract, I must determine which state's law governs the contract.

8

"Federal district courts must apply the choice of law rules of the state in which they sit when jurisdiction is based on diversity of citizenship." *Whirlpool Corp. v. Ritter*, 929 F.2d 1318, 1320 (8th Cir. 1991) (citing *Klaxon Co. v. Stentor Elec. Co.*, 313 U.S. 487, 496 (1941)).  This is a diversity case and I sit in Iowa, so I apply Iowa's choice of law rules.  Iowa courts use the "most significant relationship" test to determine which state's law governs a contract involving non-Iowa parties.  *Gabe's Const. Co., Inc. v. United Capitol Ins. Co.*, 539 N.W.2d 144, 146 (Iowa 1995).  Under that test, "[i]n the absence of a choice-of-law clause in the [contract], the rights of the parties are determined by the law of the state which 'has the most significant relationship to the transaction and the parties.'"  *Id.* (quoting Restatement (Second) of Conflict of Laws § 188(1) (1971)).

There is no choice of law clause governing the issue currently before me.  Though not mentioned by the parties, Power & Tel's invoices containing their arbitration clause also contain a choice of law clause providing that Tennessee law governs the parties' agreements (D. Ex. 2; docket no. 8-2, at 12).  But Power & Tel's choice of law clause does not govern the question of whether Power & Tel's arbitration clause is part of the head-end contract because both clauses appear in the same place— the Terms and Conditions attached to Power & Tel's invoices.  The question I must resolve is whether those Terms and Conditions ever became part of the head-end contract.  It would be circular for me to apply the Terms and Conditions to decide whether the Terms and Conditions apply.  Thus, to decide the prior question of whether the head-end contract includes Power & Tel's arbitration clause, I must determine which state has the most significant relationship to the contract.

The Restatement (Second) of Conflict of Laws § 188(2) provides a list of factors to consider in determining which state has the most significant relationship to the contract.  Section 118(2) provides:

> [T]he contacts to be taken into account . . . to determine the law applicable to an issue include:
>
> > (a) the place of contracting,
> >
> > (b) the place of negotiation of the contract,
> >
> > (c) the place of performance,
> >
> > (d) the location of the subject matter of the contract, and
> >
> > (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.
>
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement (Second) of Conflict of Laws § 188(2); *see also Gabe's Const. Co.*, 539 N.W.2d at 146 (applying these factors). The Restatement goes on to note that, "[i]f the place of negotiating the contract and the place of performance are in the same state, the local law of [that] state will usually be applied . . . ." Restatement (Second) of Conflict of Laws § 188(3).

The section 118(2) factors listed above suggest that Iowa has the most significant relationship with the head-end contract. One of the two parties to the head-end contract, Dumont, is an Iowa corporation, and its agent, Kregel, presumably negotiated with Power & Tel from Iowa. Power & Tel and CSI traveled to Iowa to present the head-end system to Dumont. The head-end equipment was shipped to, and remains in, Iowa, and the head-end system was to be installed in Iowa so as to serve Iowa customers. Given all these Iowa contacts, I conclude that Iowa has the most significant relationship to the head-end contract, and I will therefore apply Iowa law in determining the terms of that contract.

## B. Power & Tel's Motion to Compel Arbitration

Under the Federal Arbitration Act (FAA), "an agreement in writing to submit to arbitration . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Congress enacted the FAA to promote "the federal policy of encouraging arbitration as a less costly and less complicated alternative to litigation." *Morgan v. Smith Barney, Harris Upham & Co.*, 729 F.2d 1163, 1165 (8th Cir. 1984). Still, while the FAA encourages arbitration, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (quoting *Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)). "[A] gateway dispute about whether the parties are bound by a given arbitration clause raises a 'question of arbitrability' for a court to decide." *Id.* at 84 (citations omitted). "In addressing a motion to compel arbitration then, courts generally 'ask only (1) whether there is a valid arbitration agreement and (2) whether the particular dispute falls within the terms of that agreement.'" *E.E.O.C. v. Woodmen of World Life Ins. Soc.*, 479 F.3d 561, 565 (8th Cir. 2007) (quoting *Faber v. Menard, Inc.*, 367 F.3d 1048, 1052 (8th Cir. 2004)). I will address each of these questions in turn.

### 1. Is there a valid arbitration agreement?

I must first determine whether the head-end contract contains an arbitration clause. To start, I note that while Dumont and Power & Tel disagree about how to characterize many aspects of their head-end dealings, they agree on a few, important points. The parties agree that they have a contract. They agree that the contract covers the sale of head-end equipment, including STBs. They agree that their head-end equipment transactions are summarized in the five Power & Tel invoices discussed earlier. But, Dumont and Power & Tel disagree about whether the terms on those invoices—particularly the arbitration clause—ever became part of the head-end contract.

11

Much of the parties' dispute over the terms of their contract stems from their disagreement over *when* they finalized their contract. Dumont claims the contract was final the moment it gave its down-payment check to Power & Tel on July 7, 2009 (docket no. 15-2, at 3, ¶ 14). Because the parties never discussed arbitration during the July 2009 negotiations, Dumont claims the contract could not possibly contain an arbitration clause. On the other hand, Power & Tel claims that the contract's terms were not final until after it delivered its October 21, 2009, invoice to Dumont. Even then, Power & Tel argues that its first shipment completed only one of five separate contracts for head-end equipment. Thus, to resolve this dispute, I must first determine when the parties formed their contract (or at least their *first* contract).

The head-end contract involves the sale of "goods"—telecommunications equipment—and is thus governed by Article 2 of Iowa's version of the Uniform Commercial Code (UCC). *See* Iowa Code § 554.2102 (noting that Article 2 applies to "transactions in goods"); *id.* § 554.2105(1) ("'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale . . . ."). Even so, "Article 2 does not . . . entirely eliminate the common law of contracts." *Flanagan v. Consol. Nutrition, L.C.*, 627 N.W.2d 573, 578 (Iowa Ct. App. 2001). In particular, Article 2 does not eliminate the requirement that "a valid contract must consist of an offer, acceptance, and consideration." *Margeson v. Artis*, 776 N.W.2d 652, 655 (Iowa 2009).

Here, the parties disagree about where the offer occurred. Dumont argues that Power & Tel's July 2, 2009, price quote was the offer. Power & Tel argues that its price quote was too indefinite to be an offer. Instead, Power & Tel claims its October 21, 2009, invoice was the offer because it was "the first document that [was] sufficiently definite [] to be accepted" (docket no. 8-1, at 9). In reality, neither the quote nor the invoice constitutes an offer.

12

A quote's terms must be specific and definite to be considered an offer. Under Iowa law, an offer must "induc[e] a reasonable belief in the recipient that [the recipient] can, by accepting, bind the [offeror]." *Heartland Express, Inc. v. Terry*, 631 N.W.2d 260, 268 (Iowa 2001) (quotations and quotations marks omitted). "[I]f an offer is indefinite, there is no intent to be bound." *Id.* (quotation omitted). "Typically, a price quotation is considered an invitation for an offer, rather than an offer to form a binding contract." *White Consol. Indus., Inc. v. McGill Mfg. Co.*, Inc., 165 F.3d 1185, 1190 (8th Cir. 1999). Still, "under certain circumstances a price quote or catalog may constitute an offer" if it is sufficiently definite so as to leave "nothing open for negotiation." *Litton Microwave Cooking Products, v. Leviton Mfg. Co., Inc.*, 15 F.3d 790, 795 (8th Cir. 1994) (interpreting Minnesota law). "Factors relevant in determining whether a price quotation is an offer include the extent of prior inquiry, the completeness of the terms of the suggested bargain, and the number of persons to whom the price quotation is communicated." *Nordyne, Inc. v. Int'l Controls & Measurements Corp.*, 262 F.3d 843, 846 (8th Cir. 2001) (citing Restatement (Second) of Contracts § 26, comment *c*). For example, a quote "sent only to [one company]" that lists "quantity, price, and time in which to accept, as well as packaging, shipping, and payment terms" is sufficiently definite to constitute an offer. *Id.*

On the other hand, quotes containing words like "Estimate" and "Please call" are less likely to be offers because "[those] words are indicative of an invitation to engage in future negotiations rather than an offer to enter into a contract." *Dyno Const. Co. v. McWane, Inc.*, 198 F.3d 567, 574 (6th Cir. 1999); *see also Kopple v. Schick Farms, Ltd.*, 447 F. Supp. 2d 965, 975 (N.D. Iowa 2006) ("Indicia that an offer was not intended may come from various aspects of the document in question, including the title of the document and any disclaimers of intent that the document constitute an offer." (citation omitted)). Moreover, if parties continue negotiating after a quote is

issued, the quote is likely not a final offer.  *See Verasun Fort Dodge, L.L.C. v. Indus. Air Tech. Corp.*, No. C07-3013-MWB, 2008 WL 5069121, at *16 (N.D. Iowa Nov. 25, 2008) (analyzing whether the parties engaged in further negotiations after issuing/receiving a quote as a factor in determining if that quote is an offer).

In light of these standards, Power & Tel's quote cannot constitute an offer, though it is admittedly a close call.  A number of factors suggest Power & Tel's quote could be an offer:  The quote was specific to Dumont, it was based on prior conversations between Dumont and Power & Tel, it contains a detailed payment schedule, and it lists a unit price for the items Dumont eventually ordered.  But other factors suggesting that the quote is not an offer overwhelm the factors suggesting it is. The quote does not list a quantity for the STBs or antennas, other than "1," which appears to be a placeholder.  The quote leaves some aspects of the price indefinite and subject to change—*e.g.*, "Pricing is subject to site survey and customer requirements" and "Third party equipment/software pricing is subject to change."  The quote also contains the phrases "For Budgetary Purposes only" and "Estimate."

But, more important than any of the factors listed above is what the parties did after Dumont received the quote; they continued negotiating additional and different terms.  Dumont did not respond to the quote by immediately sending Power & Tel a purchase order.  Rather, Kregel waited four days and then continued negotiating contract terms with Kean over the phone.  In fact, by Dumont's own admission, the head-end "agreement was partly written and partly oral—consisting of a final quote . . . *and* conversations between [Kregel and Kean]" (docket no. 15-1, at 2) (emphasis added).  The terms after the July 6, 2009, negotiations differed from those in the quote in at least two ways:  (1) the parties added $18,478.80 in goods to the contract by specifying a quantity of STBs and antennas; and (2) the parties changed the price of certain STBs from $331 to $306.  Thus, regardless of how either party viewed the

14

quote, both parties treated it as an invitation for additional negotiation, and they orally modified the terms in the quote through their post-quote negotiations. Dumont cannot actively negotiate modifications to the quote, receive goods based on those modifications, and now claim that Dumont accepted the quote as a final offer. Given the quote's indefiniteness, as well as the parties' post-quote negotiations, I find that Power & Tel's July 2, 2009, quote cannot constitute an offer.

Power & Tel's claim that its first invoice was the offer makes even less sense. Power & Tel's first invoice is dated October 21, 2009, and Power & Tel sent it to Dumont with, or shortly after, Dumont's first equipment shipment. Treating the invoice as the offer would make this the strangest contract ever—one in which both parties perform before the offer takes place. If there was no offer until October 21, 2009, one has to wonder: What was Dumont paying for with its July 7, 2009, check? Why did Power & Tel decide to send a bundle of equipment to Dumont on or before October 21, 2009? Those actions constitute performance, and parties cannot perform a contract that has not yet been offered. The parties' actions are simply inconsistent with an offer as late as October 21, 2009.

The offer is probably somewhere in between the parties' positions. While the record does not contain the details of Kregel's and Kean's July 6, 2009, phone call, my guess is that the offer occurred sometime during that conversation. Determining the exact moment of the offer would require the parties to develop the record of their communications more extensively, and to identify the first statement by one party capable of being accepted by the other.

But there is a simpler answer: It doesn't matter. While Article 2 does not eliminate the need for an offer, an acceptance, and consideration, it does eliminate the need to pinpoint when those events occurred. "An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is

undetermined." Iowa Code § 554.2204(2). For example, an Article 2 contract can be formed simply from "*conduct* by both parties which recognizes the existence of such a contract." *Id.* § 554.2204(1). In fact, Article 2 contemplates the exact situation presented in this case:

> In many cases, as where goods are shipped, accepted and paid for before any dispute arises, there is no question whether a contract has been made. In such cases, where the writings of the parties do not establish a contract, it is not necessary to determine which act or document constituted the offer and which the acceptance.[1]

Iowa Code § 554.2207, comment 7. Not only do Dumont and Power & Tel agree that they formed a head-end contract, they both engaged in conduct recognizing that contract. The parties came to some agreement in July 2009, Dumont ordered and prepaid for head-end equipment, and Power & Tel delivered that equipment, all by the end of October 2009. Dumont then placed at least four more head-end equipment orders during the next two years, which Power & Tel fulfilled, albeit not to Dumont's satisfaction. This conduct is sufficient to find that the parties formed the head-end contract—at least the first one—sometime between July and October of 2009.

Because the parties in this case do not, and cannot, dispute that they formed a contract, "[t]he only question is what terms are included in the contract, and [Iowa Code § 554.2207] subsection (3) furnishes the governing rule." Iowa Code § 554.2207, comment 7. Section 554.2207(3) provides:

---

[1] In its resistance brief, Dumont attempts to argue that it "never accepted the [head-end] system" (docket no. 15-1, at 7). This argument seems inconsistent with its claim one page earlier that, in July 2009, "Dumont believed that it had a binding contract with Power & Tel" (docket no. 15-1, at 6), and its claim in the complaint that Power & Tel breached its contract. Dumont may not have found the head-end equipment to be "acceptable," and it may argue that it did not "accept" the equipment past its contractual return period, but it must have "accepted" the head-end equipment for the purpose of forming a contract.

16

> Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this chapter.

Under § 554.2207(3), a conduct-based contract's terms come from two sources: (1) terms on which the writings of the parties agree, and (2) supplementary terms incorporated under any other provisions of the UCC. The only contract term at issue here is Power & Tel's arbitration clause, which is not a term on which the parties' writings agree. Thus, it only becomes part of the head-end contract if it is a supplementary term incorporated by another provision of the UCC.

Power & Tel argues that the arbitration clause on its October 21, 2009, invoice became part of the head-end contract under Iowa Code § 554.2207(1)-(2). This section provides:

> 1. A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
>
> 2. The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
>
> > a. the offer expressly limits acceptance to the terms of the offer;
> >
> > b. they materially alter it; or
> >
> > c. notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

17

Iowa Code § 554.2207(1)-(2). To become part of the head-end contract, Power & Tel's arbitration clause must pass both subsections (1) and (2).

Under subsection (1), Power & Tel's invoice must qualify as either "[a] definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time . . . ." Iowa Code § 554.2207(1). Based on section 554.2207's comments, the invoice qualifies as a "written confirmation" of the parties' oral agreement:

> [Section 554.2207] is intended to deal with . . . the written confirmation, where an agreement has been reached either orally or by informal correspondence between the parties and is followed by one or both of the parties sending formal memoranda embodying the terms so far as agreed upon and adding terms not discussed.

Iowa Code § 554.2207, comment 1. Here, Power & Tel's October 21, 2009, invoice was the first formal document sent from Power & Tel to Dumont after the parties' July 6, 2009, phone conversation. Prior to the invoice, the parties reached an oral agreement, and Dumont sent an informal correspondence—the July 6, 2009, e-mail—to Power & Tel. Under section 554.2207, comment 1, Power & Tel may follow up on the oral agreement and informal correspondence with its own formal memorandum— *e.g.*, its invoice—which may add "terms not discussed"—*e.g.*, the arbitration clause.

Case law confirms what the UCC's comments suggest. "[C]ourts have quite consistently found that invoices sent contemporaneously with goods can qualify as written confirmations under UCC § 2–207." *Sudenga Indus., Inc. v. Fulton Performance Products, Inc.*, 894 F. Supp. 1235, 1238 n.3 (N.D. Iowa 1995) (collecting cases). These invoices qualify as written confirmations even if they are sent after the goods are shipped. *See All-Iowa Contracting Co. v. Linear Dynamics, Inc.*, 296 F. Supp. 2d 969, 973, 979 (N.D. Iowa 2003) (enforcing an additional term in an invoice sent to a purchaser after the purchaser picked up the goods covered by the

18

invoice); *Sudenga Indus.*, 894 F. Supp. at 1237 ("While the invoice was issued as a result of shipment and therefore was always done after the goods were shipped, the documents show that shipment and invoicing were done relatively contemporaneously" and thus the invoice qualifies as a written confirmation.). These invoices can also qualify as written confirmations even if a contract has already been formed before the invoice is created. *See BVS, Inc. v. CDW Direct, LLC*, ___ F. Supp. 2d ____, No. 11-CV-79-LRR, 2013 WL 1290940, at *7-8, *11-12 (N.D. Iowa Mar. 28, 2013) (enforcing a new term in an invoice sent as a written confirmation days after the parties' offer and acceptance). Because Power & Tel's October 21, 2009, invoice was sent contemporaneously with the first shipment of goods to Dumont and is the first document from Power & Tel following up on the parties' oral agreement, I find that it qualifies as a "written confirmation" under Iowa Code § 554.2207(1).

Before additional terms in a written confirmation become part of a contract, those terms must pass Iowa Code § 554.2207 subsection (2). Under subsection (2), the head-end contract qualifies as a contract "[b]etween merchants" because both Dumont and Power & Tel "deal[] in goods of the kind"—*i.e.*, telecommunications equipment. Iowa Code § 554.2104(1). Because both parties are merchants, the additional arbitration clause in Power & Tel's invoice automatically becomes part of the head-end contract unless:

> a. the offer expressly limits acceptance to the terms of the offer;
>
> b. [the clause] materially alter[s] [the contract]; or
>
> c. notification of objection to [the clause] has already been given or is given within a reasonable time after notice of [the clause] is received.

Iowa Code § 554.2207(2). Here, there is no evidence in the record that the offer, wherever it is, limited acceptance to its terms, nor is there any evidence that Dumont

19

objected to Power & Tel's arbitration clause within a reasonable period of time. The only question left is whether the arbitration clause "materially alters" the head-end contract.

"A clause will be held to 'materially alter' a contract when it would 'result in surprise or hardship if incorporated without express awareness by the other party.'" *N & D Fashions, Inc. v. DHJ Indus., Inc.*, 548 F.2d 722, 726 (8th Cir. 1976) (quoting UCC § 2-207, comment 4); *see also* Iowa Code § 554.2207, comment 4. Dumont argues that the arbitration clause was surprising because Dumont never read the back of Power & Tel's invoices, and that it would cause hardship by depriving Dumont of a judicial forum. Power & Tel argues that its arbitration clause does not materially alter the head-end contract because it does not directly conflict with any term previously discussed by the parties. Power & Tel also argues that its arbitration clause became part of the head-end contract through the parties' "course of performance" and "course of dealing."

While not specifically argued by Power & Tel, the "course of dealing" between Dumont and Power & Tel is relevant in determining whether Power & Tel's arbitration clause materially alters the head-end contract. "A 'course of dealing' is a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Iowa Code § 554.1303(2). "In evaluating whether [an] arbitration clause materially altere[s] [a] contract . . . '[a] prior course of dealing and the number of written confirmations exchanged between the parties is important to evaluate.'" *BVS, Inc.*, 2013 WL 1290940, at *10 (quoting *Avedon Eng'g, Inc. v. Seatex*, 112 F. Supp. 2d 1090, 1094 (D. Colo. 2000)).

For example, in *BVS, Inc. v. CDW Direct, LLC*, No. 11-CV-79-LRR, 2013 WL 1290940, at *11 (N.D. Iowa Mar. 28, 2013), Chief Judge Reade relied on contracting

parties' prior dealings in holding that an arbitration clause in a written confirmation did not materially alter a contract. The parties in *BVS* disputed whether the additional terms and conditions on one party's invoice materially altered their contract. *Id.* The court held the additional terms did not materially alter the contract. *Id.* In doing so, the court noted that, "[p]rior to this dispute, [the parties] entered into hundreds of transactions," and the complaining party had received the contested terms and conditions "hundreds of times." *Id.* Thus, the complaining party "failed to show that it was surprised by the Terms and Conditions," and those terms became part of the contract. *Id.*

Similarly, in *Avedon Engineering, Inc. v. Seatex*, 112 F. Supp. 2d 1090, 1097 (D. Colo. 2000), the court held that an arbitration provision became part of a contract after one of the parties included it in a written confirmation form. The court held that the form containing the arbitration provision did not materially alter the parties' contract because "[t]he course of dealing between the parties shows that this form was regularly sent as a confirmation for every order, both before and after the contract in dispute." *Id.* at 1095-96. Thus, the complaining party failed to show it was objectively surprised by the provision. *Id.* at 1095.

Like the parties in *BVS* and *Avedon Engineering*, Dumont entered into many deals involving Power & Tel's arbitration clause both before, and after, the head-end contract. In fact, Power & Tel's records show that it sent Dumont at least 510 invoices containing its arbitration clause before the head-end deal. Dumont did not object once. To explain why it did not object, Dumont offers Kregel's supplemental affidavit, in which Kregel claims that he "never read the back of the invoices issued" by Power & Tel (docket no. 25, ¶ 3). Kregel's statement seems to assume that a party can ward off additional terms in invoices simply by not looking at them.

21

But a party cannot claim "surprise" under Iowa Code § 554.2207 simply by neglecting to read another party's written confirmations. This is because "surprise" must be both subjective and objective: "Courts should first make factual findings as to whether a nonassenting party subjectively knew of an added term. It must then make findings of fact concerning whether that party should have known that such a term would be included." *Am. Ins. Co. v. El Paso Pipe & Supply Co.*, 978 F.2d 1185, 1191 (10th Cir. 1992) (citation omitted). Here, I find it inconceivable that Power & Tel's arbitration provision could subjectively surprise Dumont given the number of invoices containing the provision Dumont received before the head-end contract. But, even if I could fathom Kregel's explanation, it would not matter because it is not objectively reasonable for Dumont, a merchant corporation, to be unaware of a contract provision it has received 510 times before in its prior dealings with Power & Tel. *See Comark Merch., Inc. v. Highland Grp., Inc.*, 932 F.2d 1196, 1203 n.7 (7th Cir. 1991) ("We appreciate that awareness [of an additional term] does not necessarily require a party actually to have read the additional term."); *Dixie Aluminum Products Co., Inc. v. Mitsubishi Int'l Corp.*, 785 F. Supp. 157, 160 (N.D. Ga. 1992) ("[A party's] repeated failure, over sixteen prior transactions, to object to the arbitration provision (or even to read it) does not indicate unfair surprise and therefore is not 'material.'"). Thus, Dumont cannot establish that it was surprised by Power & Tel's arbitration clause.

Dumont's argument that Power & Tel's arbitration clause creates "hardship" by depriving Dumont of a judicial forum fares no better. If depriving a party of a judicial forum is enough to constitute "hardship" sufficient to materially alter a contract, then no arbitration clause could ever enter a contract through a written confirmation. There would be a *per se* rule against incorporating arbitration clauses under Iowa Code § 554.2207. But, the Eighth Circuit Court of Appeals has never endorsed such a rule. To the contrary, the Eighth Circuit Court of Appeals has held "that the question

22

whether an [arbitration] term in a written confirmation constitutes a 'material alteration' is a question of fact to be resolved by the circumstances of each particular case." *N & D Fashions, Inc.*, 548 F.2d at 726. More importantly, the FAA protects arbitration agreements as valid and enforceable, 9 U.S.C. § 2, and federal policy *encourages* arbitration. *Morgan*, 729 F.2d at 1165. Thus, the mere fact that an arbitration provision deprives a party of a judicial forum cannot constitute "hardship" for the purpose of materially altering a contract. Because Power & Tel's arbitration provision would not result in surprise or hardship to Dumont, it does not materially alter the head-end contract. Thus, under Iowa Code § 554.2207, the arbitration provision became part of the head-end contract.

Because I conclude that Power & Tel's arbitration clause became part of the original head-end contract under Iowa Code § 554.2207, it does not matter whether the head-end contract was one big contract, or five smaller ones. The arbitration clause applied to the first installment, and every other installment contained an invoice with the same arbitration clause. Thus, the arbitration clause necessarily became part of every possible head-end contract variation.

> ### 2. Does this dispute fall within the terms of the arbitration agreement?

Given that the head-end contract includes a valid, enforceable arbitration clause, the only remaining question is whether that clause covers this case. Dumont does not dispute that Power & Tel's arbitration clause, if applied, covers Dumont's claims in this case. The arbitration clause is very broad, and covers "[a]ny dispute, controversy or claim" between the parties. Dumont's lawsuit against Power & Tel is certainly a dispute, controversy, or claim. Thus, this dispute falls within the terms of Power & Tel's enforceable arbitration clause, and Power & Tel's motion to compel arbitration is granted.

### C.    I.P. Net's Motion for Stay of Proceedings

In light of Dumont's agreement to arbitrate claims against Power & Tel, I.P. Net requests that I issue a discretionary stay of Dumont's claims against I.P. Net.  Unlike Power & Tel, I.P. Net cannot contractually compel Dumont to arbitrate its claims against I.P. Net.  But, because Dumont's claims against I.P. Net, CSI, and Power & Tel involve common questions of fact, I.P. Net argues that a discretionary stay of Dumont's claims against I.P. Net would be appropriate.  Though CSI did not also move for a discretionary stay, it is similarly situated to I.P. Net.  If a discretionary stay is appropriate regarding Dumont's claims against I.P. Net, it would also be appropriate regarding Dumont's claims against CSI.

"[A] district court has discretion to stay third party litigation [that] involves common questions of fact that are within the scope of [a related party's] arbitration agreement . . . ."  *AgGrow Oils, L.L.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 242 F.3d 777, 782 (8th Cir. 2001) (quotations and internal quotation marks omitted).  "To evaluate a discretionary stay pending arbitration, courts weigh three factors:  (1) the risk of inconsistent rulings; (2) the extent to which the parties will be bound by the arbiters' decision; and (3) the prejudice that may result from delays."  *Reid v. Doe Run Res. Corp.*, 701 F.3d 840, 845 (8th Cir. 2012) (citing *AgGrow Oils*, 242 F.3d at 783).

Here, Dumont's claims against I.P. Net and CSI share common questions of fact with Dumont's claims against Power & Tel.  In its complaint, Dumont pleads five counts (docket no. 1).  All five are against Power & Tel.  Counts III and V are against Power & Tel, I.P. Net, and CSI.  Count IV is against Power & Tel and I.P. Net.  Thus, Dumont joins Power & Tel in every Count against I.P. Net or CSI.  These shared Counts—breach of express warranty, breach of implied warranty, and negligent misrepresentation—all involve common questions of fact, namely whether the head-end

system worked as warranted or represented.  Thus, Dumont's claims against I.P. Net and CSI are eligible for a discretionary stay.

Applying the three discretionary-stay factors, I find that a discretionary stay is appropriate in this case.  First, sending the Dumont–Power & Tel case to arbitration, but keeping the Dumont–I.P. Net and CSI case in federal court, would risk inconsistent rulings.  All of Dumont's claims relate to one head-end system, and how that system performed is a question common to all defendants.  An arbitrator might find that the head-end system worked exactly as warranted, whereas I might find that the system did not perform as promised.  Those rulings would obviously be inconsistent.

Second, if the arbitrator finds for Power & Tel on Counts III through V, Dumont may be bound by those findings in this case based on collateral estoppel.  "An arbitration award counts as a final judgment for collateral estoppel purposes." *Manion v. Nagin*, 394 F.3d 1062, 1066-67 (8th Cir. 2005) (citing *Wellons, Inc. v. T.E. Ibberson Co.*, 869 F.2d 1166, 1168-69 (8th Cir. 1989)).  The doctrine of non-mutual defensive collateral estoppel prevents plaintiffs who lost to a defendant in arbitration from re-litigating the same issues against co-defendants in federal court.  *See Schoenfeld v. U.S. Resort Mgmt., Inc.*, No. 05-4368-CV-CNKL, 2007 WL 2908622, at *3 (W.D. Mo. Oct. 4, 2007) (holding that collateral estoppel prevented a plaintiff from subjecting a defendant to the same claims the plaintiff previously arbitrated, and lost, against a co-defendant, even though the defendant was not a party to the arbitration).  Thus, if an arbitrator found against Dumont on an issue litigated during arbitration, Dumont may be estopped from raising that same issue against I.P. Net and CSI.

Finally, sending Dumont's claims against Power & Tel to arbitration is unlikely to prejudice any party.  "Prejudice may result from lost evidence, duplication of efforts, use of discovery methods unavailable in arbitration, or litigation of substantial issues going to the merits." *Stifel, Nicolaus & Co. Inc. v. Freeman*, 924 F.2d 157, 159

(8th Cir. 1991) (internal citations omitted).  Here, there is no indication that any evidence will be lost through arbitration.  This case is still very young, the parties have conducted little, if any, discovery, and they have not litigated any substantial issues in federal court.  No party claims that it would be prejudiced by allowing Dumont and Power & Tel to proceed in arbitration, and "[d]elay in seeking to compel arbitration does not itself constitute prejudice."  *Id.*  Thus, I conclude that staying this case pending Dumont's arbitration with Power & Tel would not result in prejudice to any party.

Dumont's non-arbitrable claims against I.P. Net and CSI share common questions of fact with Dumont's arbitrable claims against Power & Tel, and the three discretionary-stay factors favor staying this case while Dumont and Power & Tel arbitrate.  I therefore grant I.P. Net's motion for stay, which will apply equally to Dumont's claims against CSI.

### III.    CONCLUSION

Power & Tel's arbitration clause became part of the head-end contract through Power & Tel's written confirmation—its invoice—sent to Dumont contemporaneously with Power & Tel's first head-end equipment delivery and following the parties' oral negotiations.  That arbitration clause is enforceable and is broad enough to cover this dispute, and I, therefore, grant Power & Tel's motion to compel arbitration.  I also stay Dumont's claims against I.P. Net and CSI pending the resolution of Dumont's arbitration with Power & Tel.

**THEREFORE,**

Power & Tel's motion to compel arbitration (docket no. 8) is granted.  I.P. Net's motion for stay (docket no. 26) is granted.  This case is stayed as to all parties, subject to the following instructions:

26

(1) The parties are directed to proceed to arbitration on Dumont's claims against Power & Tel according to the terms of the arbitration clause in Power & Tel's October 21, 2009, invoice, and pursuant to 9 U.S.C. § 4;

(2) Dumont's claims against Power & Tel are stayed until such arbitration has been had in accordance with the terms of the agreement, pursuant to 9 U.S.C. § 3, and Dumont's claims against I.P. Net and CSI are stayed pursuant to my authority to issue a discretionary stay;

(3) The parties shall file, jointly or separately, status reports on the status of the arbitration proceedings and the need, if any, for further proceedings in this court not less than thirty days from the date of this order and not less than every thirty days thereafter; and

(4) I.P. Net may wait until no later than 15 days after the stay is lifted to serve a response to Dumont's complaint.

**IT IS SO ORDERED**.

**DATED** this 26th day of August, 2013.

_Mark W. Bennett_
_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA